## APPEAL OF GEORGE W. WOOLFORD ET AL.

### [Roper et al. v. Woolford et al.]

FROM THE DECREE OF THE COURT OF COMMON PLEAS NO. 2
OF PHILADELPHIA COUNTY, IN EQUITY.

Argued April 12, 1889—Decided April 29, 1889.

Under the rules and laws of the fraternity, the union effected in 1882
between the Ancient York Masons, composed of colored persons, and
the Free and Accepted Masons, also composed of colored persons,
was a legal union, and real estate which had been given in trust for cer-
tain lodges of the Ancient York Masons prior to 1882, vested in the
Most Worshipful Grand Lodge of Free and Accepted Masons formed
by the union, and in the lodges of the Ancient York Masons, benefited
by the trust, which came into the union.

Before PAXSON, C. J., GREEN, CLARK, WILLIAMS and Mc-
COLLUM, JJ.

No. 262 January Term 1889, Sup. Ct.; court below, No. 770
March Term 1883, C. P. in Equity.

On May 5, 1883, a bill in equity was filed by George W.
Roper et al., composing the Most Worshipful Grand Lodge of
Free and Accepted Masons of the state of Pennsylvania, lately
known as the Most Worshipful Grand Lodge of Free and Ac-
cepted Ancient York Masons of the state of Pennsylvania; the
Widow's Son Lodge, No. 4; the Hiram Lodge, No. 5; the Pru-
dence Lodge, No. 11; the Mount Olive Lodge, No. 27; certain
persons named, who with five others not complainants, con-
stitute Phœnix Lodge, No. 3; certain persons named, who
with five others not complainants, constitute Mount Lebanon
Lodge, No. 9 (each of said last named lodges being a subor-
dinate lodge of the said grand lodge); and Fielding Ford,
Alexander R. Lively, claiming to be, and Theodore F. Young,
William H. Miller, James T. Robinson, and James Augustus,
being certain of the trustees under a deed of trust set out in
the bill.

The defendants were George Woolford, Alfred S. Cassey,
and Charles B. Colley, trustees under said deed of trust,

Statement of Facts.

and Thomas W. Allmond, and Hans Shadd, claiming to be trustees under said deed of trust; certain persons named also, together with others unknown, composing respectively Laurel Lodge, No. 2, and Athenian Lodge, No. 24 (each of said lodges being a subordinate lodge of the grand lodge, complainant) ; Samuel Baker and four other members of Mount Lebanon Lodge, No. 9 ; and Thomas Dornan and four other members of Phœnix Lodge, No. 3 (each of said lodges being subordinate lodges of the grand lodge, complainant).

The bill set out a deed of trust dated July 30, 1872, conveying to trustees a certain lot with a hall thereon erected " for the only use and behoof of the Most Worshipful Grand Lodge of Free and Accepted Ancient York Masons for the state of Pennsylvania, under the jurisdiction of the Most Worshipful National Grand Lodge of Free and Accepted Ancient York Masons of the United States of America " and for the use also of the subordinate lodges, No. 2, No. 3, No. 4, No. 5, No. 9, No. 11, No. 24 and No. 27.

The bill further averred that the lodges named in the deed met in the hall until after the commencement of the year 1883. That prior to December 26, 1882, there existed a body known as the Most Worshipful Grand Lodge of Free and Accepted Masons of Pennsylvania, whose constitution and general regulations were in all respects in substance identical with those of the Grand Lodge of the Free and Accepted Ancient York Masons before mentioned. That at a meeting of the Grand Lodge of the Free and Accepted Ancient York Masons at which the said eight subordinate lodges were represented, it was unanimously resolved that said grand and subordinate lodges should meet with the said Grand Lodge of Free and Accepted Masons of Pennsylvania and its subordinate lodges in joint convention on December 26, 1882, to make a complete union between the two organizations. That on that day such Grand and subordinate lodges, including said eight, met in joint convention, adopted a constitution exactly similar in all substantial respects to that of the said Grand Lodge of Ancient York Masons, and elected officers.

That after this merger, Woolford, Allmond, Shadd, Cassey, and Colley, and certain members of Lodges Nos. 2 and 24, with the five members of Lodge 9, and five members of Lodge 3,

Statement of Facts.

who are made defendants in the suit, conspired to deprive the complainants of the use of said hall, and have excluded the said Grand Lodge, established by the union, and the complainants and said Lodges Nos. 9, 3, 5, 11, 27, and 4, from all use and occupancy thereof.

That said Lodge No. 9, at a meeting held in January, 1883, after said exclusion, removed said Allmond for his misconduct from his trusteeship, and elected in his place Fielding Ford, who has accepted the trust; and said Lodge No. 3, at a meeting held in the same month, removed for the same cause Shadd, and elected in his place A. R. Lively, who has accepted the trust.

That defendants have refused to permit Ford and Lively to enter said premises or to act as trustees thereof, and the trustees defendant have permitted Allmond and Shadd, though duly removed, to act with them in the management of said hall.

The bill prayed for an injunction restraining defendants from interfering with the complainants in entering upon and using the premises, and restraining Shadd and Allmond from acting as trustees of the premises; for a decree that the title to said premises is vested in Woolford, Ford, Lively, Young, Miller, Robinson, Augustus, Cassey and Colley, in trust for complainants, The Most Worshipful Grand Lodge of Free and Accepted Masons, and in trust for subordinate lodges, Nos. 9, 3, 5, 11, 27, 4, 24 and 2.

The answer denied that the Grand Lodge of the Ancient York Masons had sanctioned and affirmed the articles of union, averring that there never was a legal union between the two organizations. The answer also denied that the constitution of the new organization was similar in all substantial respects to the constitution of that of the Ancient York Masons.

The case was referred to *Mr. S. S. Hollingsworth*, as examiner and master, who in his first report found as a fact that there was a legal union effected between the two organizations, but that there was no evidence to support the averment of the bill that the new organization was in all substantial respects similar to the Ancient York Masons.

He therefore recommended a decree that the bill be dismissed.

Subsequently, on application of the complainants the report

was referred back to the master to take additional testimony " as to the character and purpose of the masonic associations referred to in the master's report."

The master heard the additional testimony and subsequently made a second report which was as follows:

In his previous report the master found that if a union between the Ancient York Masons and the Free and Accepted Masons could be lawfully made, it had been regularly and properly effected.

He also found that upon the facts proven before him there was not shown such a similarity in purpose and character, in beliefs, opinions and practices between the Ancient York Masons and the Free and Accepted Masons, and the new organization formed under the union, as justified him in finding that the union had been lawfully made. The case was then sent back to him under an order of court allowing the plaintiffs and defendants " To take additional testimony before the master as to the character and purposes of the masonic associations referred to in the master's report." Under this reference there have been put in evidence before the master the constitution of the Ancient York Masons, the constitution of the Free and Accepted Masons, and the constitution of the Most Worshipful Grand Lodge of Free and Accepted Masons of Pennsylvania, being the new lodge formed under the union of the two other Grand Lodges.

By reference to article VI. of the constitution of the new lodge and part III. of the constitution and general regulations of the Ancient York Masons, it will be found that the powers and privileges of the grand lodge are set forth in exactly and identically the same words. Upon a further reference to article XXI. of the constitution of the new lodge, entitled " Masonic Law," and part II. of the constitution and general regulations of the Grand Lodge of Ancient York Masons, it will be found that section I. and section IV., each of which sets forth how " the action of Free Masons in their grand and subordinate lodge or in their individual character is regulated and controlled," are precisely the same. The definition of ancient landmarks is precisely the same.

It is true that the constitution of the Most Worshipful

Grand Lodge of the new organization does not set forth *all* the
ancient landmarks that are set forth in the constitution and
general regulations of the Grand Lodge of Ancient York Ma-
sons, but while the constitution of the new Grand Lodge does
not set forth all the ancient landmarks, still, after setting forth
certain ancient landmarks, it says in article XXI., section 24,
" Besides these there are various landmarks which constitute
the framework of the government of the fraternity; and the
indispensable discharge of various duties and relations growing
out of them, which are incorporated in the constitution;"
showing that there are other landmarks than those actually set
forth in the constitution itself.

So that so far as appears by an inspection of the constitu-
tions of the two societies, in those particulars which are material
and which affect their vital fundamental principles, they ap-
pear to be identically the same.

This identity of character is confirmed by the testimony of
the witnesses who were examined.   There were called by the
plaintiffs three witnesses, Mr. Miller and Mr. Roper, who were
members of the former Grand Lodge of Ancient York Masons,
and Mr. Joshua D. Kelley, who was a member of the organ-
ization known as the Free and Accepted Masons.   The testi-
mony of these witnesses shows beyond any doubt that the
ancient landmarks that govern the masonic fraternity are one
and the same, and that there is no difference in them whatso-
ever; they are the same for all masonic organizations.

Mr. Miller said : " They " (referring to ancient landmarks)
" are unalterable.   The ancient landmarks of the masonic
fraternity are unalterable.   On the ancient landmarks is pre-
dicated the rules that govern the masonic fraternity.   Noth-
ing can be adopted in derogation of those landmarks."   In
answer to the question, " Is there or is there not any differ-
ence in the landmarks which are spoken of in these various
constitutions?" the witness says : " There is no difference
whatever."

His testimony is corroborated by the testimony of Mr. Roper
and of Mr. Kelley, and is not contradicted or qualified in any
way whatsoever by the testimony of any one of the witnesses
called on the part of the defendants.   It seems to be estab-
lished by all the evidence in this case that the ancient land-

marks, in derogation of which nothing can be adopted by any masonic fraternity, are the same in all these organizations, so that the fundamental rules that govern the policy, the purposes, the character, and the practices of these bodies are the same in all.

In addition to this it is shown that the Ancient York Masons and Free and Accepted Masons originally constituted one body; that they separated early in the century, one of them, so to speak, "flocking by itself"; that they united again in 1847 or 1848, and formed a union without, so far as any evidence goes before the master, there being any previous healing of the members of the subordinate lodges, and that they subsequently separated again, and that the only difference between them seemed to be the connection of the Ancient York Masons with a National Grand Lodge. This connection with a National Grand Lodge was severed, according to the evidence, in 1881, and there then stood nothing in the way of a union between these two bodies, the Ancient York Masons and the Free and Accepted Masons, so far as the master has been able to understand the masonic rules and laws which have been brought to his attention.

On the part of the defendants it was shown, and established beyond any doubt, that one of the ancient landmarks of Masonry was that there could be no intercourse with a "clandestine" mason until he was "healed." It was attempted to be shown that the only method of healing was by "re-obligating" by the Grand Lodge, and one of the witnesses called by the defendants has so sworn, but, on the other hand, one of the witnesses called by them, Mr. Cropper, admits that had the provisions of the articles of union been carried out according to their terms, in a legal method, the union would have been a valid legal union according to the masonic law. Another of the witnesses, Mr. Cassey, admits the same thing, with this qualification, that in order to be legal, according to masonic law, such union must have had the unanimous consent of subordinate lodges, and failing that unanimous consent it lacked that element of legality. Mr. Cassey's testimony was this: "Q. What provision would be required to make those articles legal? A. They would have had to first repeal all edicts issued against each other; then, I think, it would have been

legal to have met in convention. I take the precedent of masonic bodies in the past and their history. That is the course that is always pursued."

If it was competent for these bodies to form a legal union, as Mr. Cassey said, by repealing the edict which expelled or did something to render these lodges clandestine, surely the same result could be accomplished by both bodies doing, and was accomplished when both bodies did, what the articles of union provided, viz., that they should meet in union, and, after approval of the articles of union, should " proceed to adopt a constitution and elect a Grand Master and other officers necessary to establish a Grand Lodge, and on the day of St. John, December 27th, A. D. 1882, they shall assemble and open a Lodge of Master Masons, and install the officers elected the previous day, and proclaim the same."

If such united action sanctioned by both Grand Lodges failed to heal all the "clandestine" masons, who participated in the union, it would be a singular instance of the subordination of substance to form. The master finds that the objection to the legality of the union, viz., that the "clandestine" masons were not *first* "healed" before the union, is not sustained by the evidence, and that the objection itself is not within the scope of the reference.

The master finds on the whole evidence that the union was not only regularly and properly made, but that such union in fact was a lawful one, and that the new Grand Lodge formed by the union, i. e., The Most Worshipful Grand Lodge of Free and Accepted Masons of the State of Pennsylvania and its subordinate lodges Nos. 9, 3, 5, 11, 27, 4, 24, and 2, are the legal beneficiaries of the trust created by the deed of July 6, 1863.

The relief prayed for seems proper, and the master recommends that a decree be made in accordance with the prayers of the bill.

Numerous exceptions were filed to the master's report, all of which were dismissed, and a decree was entered in accordance with the second report. The defendants thereupon took this appeal assigning as error the decree of the court, and the dismissal of their exceptions.

*Mr. J. Alexander Simpson* and *Mr. F. Carroll Brewster* for the appellants.

*Mr. Frank P. Pritchard* and *Mr. John G. Johnson* for the appellees.

PER CURIAM:

The learned court below affirmed the report of the master without filing an opinion. We do the same. It is so clear and satisfactory that it would be a work of supererogation to add anything to what he has so well said. His findings of facts are warranted by the evidence and his conclusions of law are correct.

The decree is affirmed and the appeal dismissed at the costs of the appellants.