In the Matter of the Estate of CHARLES H. RATHBONE, Deceased.

Surrogate's Court, New York County, March 10, 1939.

*Davies, Auerbach & Cornell* [*Dermod Ives* of counsel], for the executors.

*Cadwalader, Wickersham & Taft* [*Thomas B. Gilchrist* and *Hampton D. Ewing, Jr.*, of counsel], for The Salvation Army.

*Blake & Voorhees* [*Edward I. Devlin, Jr.*, of counsel], for the Trinity Commandery No. 58, K. T., the Northern Star Lodge No. 555, F. & A. M., and others.

*John A. Dutton* [*Leone Pecoraro* of counsel], for the Masonic Home of Pennsylvania and the Santa Fe Lodge of Perfection No. 1, Ancient & Accepted Scottish Rite of Freemasonry.

*Bertram de Young* [*of the Pennsylvania bar*], for The Masonic Home of Pennsylvania.

*John Preston Phillips*, for Syria Temple.

*Rutherford S. Moorhead*, for the Imperial Council Ancient Arabic Order of the Nobles of the Mystic Shrine for North America, an Iowa corporation.

*John D. Armstrong*, for the Ancient Arabic Order of the Nobles of the Mystic Shrine for North America, a Colorado corporation, and for the Shriners Hospitals for Crippled Children.

*John Godfrey Saxe* [*James K. Seery* of counsel], for Columbia University.

*DeForest, Cullom & Elder* [*Frederick Schlater* of counsel], for the Presbyterian Hospital.

*White & Case* [*Vermont Hatch* and *Dudley Miller* of counsel], for Charles H. Rathbone, 3d, infant.

*Davis, Polk, Wardwell, Gardiner & Reed,* for the Guaranty Trust Company.

*Paul E. Mead,* for the Irving Trust Company.

DELEHANTY, S.    In this proceeding petitioners seek a construction of paragraph third of the codicil to the will of deceased.    They seek also a determination of the effect on the property dispositions made in the will and codicil of the limitation prescribed in section 17 of Decedent Estate Law.    They ask a ruling in respect of the capacity of certain corporations and unincorporated associations to take the benefits prescribed for them under the will and codicil. Finally they ask to have determined the identity of the recipient or recipients of any property of deceased in respect of which he may be held to have died intestate.    The portions of the will material to the problem say:

" *Ninth.* I give and bequeath to Rathbone Cemetery Association, of Potter County, Pennsylvania, a corporation organized under the laws of the State of Pennsylvania on September 1st, 1899, the sum of Three thousand Dollars ($3,000) to be used as needed for the upkeep and maintenance of its cemetery grounds.

" *Tenth.* I give and bequeath to the Masonic Home of Pennsylvania, located in Philadelphia, Pennsylvania, the sum of Five thousand Dollars ($5,000) to be used in the discretion of the managers thereof.

" *Eleventh.* I give and bequeath to Northern Star Lodge #555, Free and Accepted Masons, located at Duke Center, Pennsylvania, the sum of Five thousand Dollars ($5,000).

" *Twelfth.* I give and bequeath to Trinity Commandery #58 K. T. located at Bradford, Pennsylvania, the sum of Five thousand Dollars ($5,000).

" *Thirteenth.* I give and bequeath to Syria Temple (Ancient Arabic Order of the Nobles of the Mystic Shrine) located in Pittsburgh, Pennsylvania, the sum of Five thousand Dollars ($5,000).

" *Fourteenth.* I give and bequeath to New Mexico Consistory No. 1 (Valley of Santa Fe, Orient of New Mexico) located in Santa Fe, New Mexico, the sum of Five thousand dollars ($5,000).

" *Fifteenth.* I give and bequeath to the Lodge of Benevolent and Protective Order of Elks, located in Bradford, Pennsylvania, the the sum of Five thousand Dollars ($5,000).

" *Sixteenth.* I give and bequeath to the Presbyterian Hospital in the City of New York, incorporated by the Legislature of the State of New York in the year 1868, to be applied to the uses and benefits of said Hospital under the direction of the management thereof, the sum of Ten thousand Dollars ($10,000).

"*Seventeenth*. I give and bequeath to Trustees of Columbia University in the City of New York, to be used as the Trustees may direct, for the Medical Center, the sum of Ten thousand Dollars ($10,000).

"*Eighteenth*. I give and bequeath to the Salvation Army, now located at 120–130 West 14th Street, Manhattan, New York City, to be used solely in Greater New York, the sum of Ten thousand Dollars ($10,000)."

None of the quoted provisions of the will is altered by the codicil. The codicil, however, substituted the original nineteenth paragraph of the will by a new paragraph third in the codicil which says:

"*Third*. I amend paragraph 'Nineteenth' of said Last Will and Testament to read as follows: That should my son, Charles H. Rathbone, Jr., be living at the time of my death I give, devise and bequeath all the rest, residue and remainder of my property, real, personal and mixed wheresoever situated unto the Irving Trust Company of New York, a New York Corporation having its principal office in the Borough of Manhattan, City and State of New York, as Trustee and in trust for the purposes and uses following:

"To receive, collect and recover the rents, issues, interest, income and profits thereof and pay over to my said son, Charles H. Rathbone, Jr., a maximum amount of four hundred ($400) dollars per month, payment to be made at least semi-annually. Should the rents, issues, interest, income and profits from my said estate be less than this said amount of four hundred ($400) dollars per month, my said son, Charles H. Rathbone, Jr., is to receive such smaller amount in lieu of the said four hundred ($400) dollars per month as it is my wish and intention that he shall not receive any of the corpus of my said estate but only such income as it may produce up to but not in excess of four hundred ($400) dollars per month.

"In the event of the death of my said son, Charles H. Rathbone, Jr., I give, devise and bequeath all of the said trust estate and property as follows:

"One-half to the Salvation Army, now located at No. 120–130 West 14th Street, Borough of Manhattan, City and State of New York, to be used solely in Greater New York.

"The remaining one-half to be divided equally between the Masonic Home of Pennsylvania, located in Philadelphia, Pennsylvania; the Northern Star Lodge #555, Free and Accepted Masons, located at Duke Center, Pennsylvania; the Trinity Commandery #56 K. T. located at Bradford, Pennsylvania; the Syria Temple (Ancient Arabic Order of Nobles of the Mystic Shrine) located in Pittsburgh, Pennsylvania; the New Mexico Consistory No. 1

(Valley of Santa Fe, Orient of New Mexico) located in Santa Fe, New Mexico, share and share alike.

" If any of the said beneficiaries are not in existence at the time of the death of my said son, Charles H. Rathbone, Jr., I give and bequeath its share to such beneficiaries as are in existence at that time share and share alike."

Deceased had a son, Charles H. Rathbone, Jr., who predeceased his father. Deceased was survived by an infant grandson, Charles H. Rathbone, III, his sole distributee.

It is appropriate first to consider a fundamental attack made upon the testamentary scheme by the guardian of the infant grandson of deceased. In behalf of the infant it is asserted that the attempted disposition of the residuary estate under the quoted paragraph of the codicil failed wholly because the remainder gifts to the named institutions were conditioned on the survivorship of Charles H. Rathbone, Jr.; and that since Charles H. Rathbone, Jr., predeceased his father the gifts failed. This contention in untenable. Deceased first provided that if his son were to survive him the residuary estate should be set up in trust and a stated income therefrom paid to his son. Later in the same paragraph he disposed of his residuary " in the event of the death " of his son. Neither reason nor authority supports the argument that the testator by this codicil required that a trust estate must preliminarily be set up before the institutions named in the paragraph of the codicil could participate in the residuary estate. The phrase, " in the event of the death," must be held to mean a death either before or after that of deceased. The fact that in the later dispositive provisions the words " the said trust estate and property " precede the gifts to the alternate residuary beneficiaries do not support the argument that these beneficiaries were to have only a portion of a " trust " estate. The phrase " the said  *  *  * property " is completely descriptive of the remainder of the estate. The word " property " as used in the gifts over to the substitutional beneficiaries is the same as the word used in the introductory portion of paragraph third when deceased speaks of " all the rest, residue and remainder of my property." It would wrench the words " trust estate " out of their fair intendment and meaning to say that they were inserted in this paragraph of the codicil as words which controlled the interests of the beneficiaries of the residuary if the son of deceased had predeceased him. So to argue is to say that deceased left unprovided for a most important element in his testamentary scheme. The presumptions against intended intestacy are substantial presumptions. Resort to them need not be had to support the construction here given, but they confirm

the validity of that construction. The court holds that the phrase "in the event of the death" means in the event of such death either before or after deceased. The court holds in consequence that the gifts over under paragraph third of the codicil neither depend upon the survivorship of deceased by his son, Charles H. Rathbone, Jr., nor depend upon the prior setting up of a trust estate. (*Matter of Fordham*, 235 N. Y. 384, 387; *Norris* v. *Beyea*, 13 id. 273, 287; *Williams* v. *Jones*, 166 id. 522, 533; *Mead* v. *Coolidge*, 179 id. 386, 390, 391, 392.)

In behalf of the infant distributee of deceased the will and codicil are challenged on the ground that more is given to charity than is permitted under the provisions of section 17 of the Decedent Estate Law. It is conceded by all of the institutional beneficiaries except the beneficiary under the ninth paragraph of the will that they fall within the terms of section 17 of the Decedent Estate Law. The court finds that the beneficiary under the ninth paragraph of the will is also within the terms of the statute. (*Matter of Mawhinney*, 146 Misc. 30; affd., 239 App. Div. 874.) Since this is not an accounting proceeding the court is limited at this time to the ruling made at the hearing, to wit: That any excess of otherwise validated gifts to charity over one-half of the gross estate (less debts) will pass to the infant grandson of deceased as intestate property under section 17 of the Decedent Estate Law. It seems to be assumed that the distributee of deceased will succeed to certain property under this ruling. The court cannot anticipate the finances of the estate, and definitive ruling on the operation of section 17 of the Decedent Estate Law must await an accounting. The court will defer to an accounting and to a time when the finances of the estate are fully known all subsidiary questions which may arise respecting abatements or priorities among the charities held to be entitled to take. These rulings leave for determination a number of issues in respect of which the court took a substantial body of oral and documentary proof. The questions now to be discussed are those which concern the capacity of the persons and associations named by deceased in his will and codicil to take the benefits which he intended for them.

### I. CORPORATE LEGATEES.

The capacity of Columbia University, of Salvation Army, of Presbyterian Hospital and of the Masonic Home of Pennsylvania to take testamentary gifts under their charters is conceded. It is also conceded that the activities of each of these four are charitable within the meaning of section 17 of the Decedent Estate Law. Each is capable of receiving such benefit as deceased is found to have conferred upon it validly by his will and codicil. A word should

be said about the Masonic Home of Pennsylvania, a foreign corporation. It is incorporated pursuant to a special act of the Pennsylvania Legislature. It provides shelter, food, clothing and other care for indigent Free Masons and for the latter's indigent wives and widows. Because its bounty is restricted to Masons and the relatives of Masons the corporation has been held under Pennsylvania law not to be a " purely public " charity within the meaning of a tax exemption statute. (*Philadelphia* v. *Masonic Home of Penna.*, 160 Penn. St. 572; 28 A. 954.) The cited case, however, says that the corporation " is clearly a charity." Concededly the group of Masons in Pennsylvania numbers about 500,000 persons and any needy member of that group is within the scope of the work of the Masonic Home. The special charter of the home authorizes it expressly to receive testamentary gifts. Accordingly, the home is held to have capacity to take the legacies bequeathed to it.

## II. UNINCORPORATED ASSOCIATION LEGATEES.

The will and codicil purport to confer benefits on five separate unincorporated associations, four of which claim to be capable of taking directly the gift bequeathed. In respect of the fifth a corporate organization allied with the named association has come in to claim the gift. The grounds asserted by these legatees in support of their respective claims vary considerably and require separate examination.

(a) *Northern Star Lodge.*— The eleventh paragraph of the will and the third paragraph of the codicil give to " Northern Star Lodge #555 Free and Accepted Masons " a general legacy of $5,000 and in adition one-tenth of the residuary estate. In the answer filed by this legatee it alleges that it is an unincorporated voluntary association and a branch of the " Grand Lodge, Free and Accepted Masons of Pennsylvania, an unincorporated voluntary association." It further alleges that its principal purposes and objects " are religious, educational and charitable." It asserts that under Pennsylvania law it has the capacity to take the benefits designed for it by deceased since the principal purposes of the association are charitable in the generic sense. In support of these allegations in its answer this legatee offered proof that it is one of 566 subordinate " Blue " lodges operating under charters granted by the Grand Lodge of Pennsylvania. While some proof was presented by this legatee concerning the charitable activities of the Grand Lodge, it should be noted in passing that no contention is made that the gift was intended for the Grand Lodge. It is claimed by the subordinate lodge. Each member of Northern Star Lodge was

required on admission to be white, free, twenty-one and of good moral character. The difference between Northern Star Lodge and the Grand Lodge was stated by a witness thus: " Subordinate lodges are chiefly concerned with the teaching of Masonic principles and practices. The Grand Lodge is more concerned with the preservation of the organization and the charitable activities to which the lodges contribute generally." In the case of the subordinate or " Blue " lodges charity in the sense of almsgiving is confined to the " relief of members and the families of members." The officer of Northern Star Lodge who testified in support of the claim that it was an association for religious purposes stated that there is no charter, warrant or other instrument defining such purposes. The witness himself described them as " to promote friendship among the members and to teach and emphasize the importance of the virtues prescribed in the decalogue." He said he preferred " not to enter into a detailed description " of the religious nature of the lodge. When counsel characterized the lodge as a " secret society " the witness substituted the phrase " private society." In the lodge rooms the Bible is always present during meetings. It was testified that the degrees conferred upon members take their inspiration from the Bible, which is called the " Great Light of Masonry." Meetings open and close with prayer. The proceedings in the meeting were said to constitute a " general educational function in moralities " and to teach " moral and religious principles, that is, the general religious principles as differentiated from sectarian religious principles."

The annual dues of five dollars are divided between the local lodge and the Grand Lodge, the latter receiving two dollars. The initiation fee of ninety-five dollars is divided fifty-five dollars to the " Blue " lodge and forty dollars to the Grand Lodge. Northern Star Lodge has a charity committee of three members. It owns a two-story brick building called the Temple, of which the lower floor is rented for business purposes. It pays taxes on its real estate. The lodge income for 1936 was $1,402.50 and for 1937 $2,124.61. Its record of disbursements shows that the lodge transmits to the Grand Lodge about $320 per annum and expends the balance chiefly on the operations of the local lodge.

On the record Northern Star Lodge states that it relies on its " religious " character as establishing its capacity to receive the benefit of deceased's gift.

(b) *Trinity Commandery, Knights Templar.*— The will and codicil confer upon the " Trinity Commandery #58 K. T." exactly the same benefits as those conferred upon Northern Star Lodge. The commandery interposed an answer to the petition substantially

the same as that filed by Northern Star Lodge. The commandery is an unincorporated voluntary association which is a branch of the " Grand Commandery of Knights Templar  *  *  *  an unincorporated voluntary association." It claims that its purposes are religious, educational and charitable and that by virtue of its quality as a charity it has capacity under Pennsylvania law to take deceased gifts. The Grand Commandery granted to the Trinity Commandery a charter " for the purpose of diffusing the benefits of the Order and promoting the happiness of man." The by-laws of Trinity Commandery provide: " In order to insure stability and perpetuity to the Commandery there shall be established a permanent fund." To this fund the by-laws require that there be appropriated " all moneys or property which may accrue to the Commandery by donation, gift, devise or otherwise for this purpose." The by-laws also require that " the fund thus created shall not be impaired or diminished but shall be increased from time to time as the finances of the Commandery may admit." This fund is required to be invested by the trustees of Trinity Commandery. The treasurer is required to keep the funds of the commandery " with a banking or trust company, through which account all moneys received and disbursed shall pass." The treasurer " shall pay no moneys except in pursuance of a resolution of the Commandery." No direction in the by-laws provides for the use of the income from investments. Trinity Commandery has dispensed no alms owing to lack of funds available for such purpose. Its total receipts for the fiscal year ending May 1, 1938, amounted to $1,879.50 — a fund originating from dues and initiation fees.

Admission to the commandery requires membership in a " Blue " lodge, belief in a Supreme Being and in the Christian religion and residence in the jurisdiction of the commandery. The commandery confers degrees of Masonry from the fourth to the thirty-second, inclusive. Meetings are held for the purpose of " conferring degrees and (disseminating) the teachings of the Order." The witnesses declined to reveal the means used in disseminating the teachings of the order or the ritual employed therein.

In support of the claim that the legatee promotes education a witness stated that it had developed an " Order of De Molay," which is open to adolescents and operates much in the fashion of a big brother movement. The officer of the commandery who testified (a Pennsylvania lawyer) seemed to concede that on the facts presented Trinity Commandery must rely solely upon its quality as a religious organization for inclusion among " charitable associations." To evidence this religious character the witness spoke of his own personal spiritual experience and expressed the

view that the association was "overwhelmingly religious." When faced with the difficulty that his testimony constituted a body of conclusions and expressions of opinion about underlying facts which were withheld from the court on the ground of the secrecy of the ritual, the witness said: "Well, in a particular group of friars * * * I am not permitted to know their peculiar rites * * * but I would not hestitate to hold they are a religious body. I am not thinking of religion from the standpoint of the church; I am thinking of it from the standpoint of the uplift of morality, of the benefit to human kind * * *. There is nothing in the ritual. The mysticism in itself teaches nothing." When recalled toward the close of the hearings this witness said respecting the commandery: "The only secrets connected with it are the symbols of Free Masonry, which are only a means to an end." His testimony showed that in the jurisdiction of Trinity Commandery only about 500 persons could satisfy the conditions for admission to it.

(c) *Syria Temple, Mystic Shrine* (and allied corporations).— The thirteenth paragraph of the will and the third paragraph of the codicil provide benefits for "Syria Temple (Ancient Arabic Order of the Nobles of the Mystic Shrine)" to the same degree as the benefits intended for Northern Star Lodge and Trinity Commandery. In addition to the unincorporated association thus described there are three corporations claiming this gift and there is reference in the proof to a fourth corporation which might in some aspect be regarded as entitled thereto on a basis asserted by one of the other corporations.

The first claimant for the benefits is the voluntary unincorporated association which holds a charter from "The Imperial Council of the Ancient Arabic Order of the Nobles of the Mystic Shrine," an Iowa corporation. It alleges that its principal objects are "charitable and fraternal." Its answer alleges by implication that if the court should find that it lacks capacity to take as an unincorporated association the fund should then be held payable to "Syria Improvement Association," a *Pennsylvania* corporation. An *Iowa* corporation issued the charter to Syria Temple. The Pennsylvania corporation was "formed for the purpose of purchasing, taking, holding, improving, selling and leasing real estate" in behalf of the unincorporated association. The argument of counsel for the unincorporated association is that the gift is good because the principal purposes of the association are charitable. Counsel in the alternative argues that in any event the gift should go to Syria Improvement Association either outright and absolutely or as a gift in trust for the uses of the unincorporated association known as Syria Temple.

The Iowa corporation which granted the charter to Syria Temple did not appear at the inception of the proceeding but came in later. In a similar way an appearance was made by a Colorado corporation which has a name identical with that of the Iowa corporation. This Colorado corporation operates Shriners' hospitals. Reference is made in the proof to a Georgia corporation known as " Shriners Hospitals for Crippled Children." This apparently was organized at the behest of the original unincorporated Imperial Council to furnish a corporate structure which could validly receive gifts and could validly operate the charities of the Imperial Council. By formal answer and by memorandum the Iowa corporation asserts its right to the benefits sought to be conferred on Syria Temple. By appearance and memorandum the Colorado corporation claims that the gift is payable to it. An appearance has been filed by the Georgia corporation but it has made no claim to the gift.

The unincorporated association known as Syria Temple appears to have originated on February 6, 1878, by virtue of a " dispensation " dated May 19, 1877, granted by " The Imperial Grand Council " of the Mystic Shrine. This Grand Council was at the time an unincorporated association. The charter granted was to a group named " Illustrious Nobles " and empowered them and their successors to " exemplify the Order upon all whom they deem worthy of such honor." The proof showed that the unincorporated Imperial Council was absorbed by the Colorado corporation (organized in 1925) which first exercised the fraternal powers of the Mystic Shrine and operated its charitable activities, except as such activities were already operating under the Georgia corporation. In 1936 the Iowa corporation was organized to take over the fraternal activities of the Mystic Shrine, leaving the Colorado corporation to devote its efforts exclusively to charitable purposes. The latter sought in 1936 to divest itself of its fraternal functions by amendment of its charter. Thus the subordinate temples treat the Iowa corporation as the source of the charters under which the subordinate temples operate. In making remittance for charitable purposes the subordinate temples send the money in the first instance to the Iowa corporation but the latter transmit it in full to the Colorado corporation which disburses all of it. The constitution and regulations of the Imperial Council — the Iowa corporation — plus the by-laws adopted by the subordinate temple govern the operations of each temple.

The by-laws of Syria Temple provide that its trustees shall vote the shares of stock owned by the temple in Syria Improvement Corporation. Except for two qualifying directors' shares the temple is the record owner of all the shares. It is the beneficial owner of

the entire issue. Syria Improvement Corporation exists, according to the by-laws of Syria Temple, in order to have " entire control and management of the real estate and the other property of the Temple." Article XVIII, section 1, of the by-laws of the temple provide: " The revenue derived from all sources by the Temple, any of its subordinate organizations or committees, excepting dues of subordinate organizations or any donations they may receive, shall be for the sole benefit of Syria Temple."

On January 1, 1938, Syria Temple had a membership of 13,711 persons, each of whom was required to pay twelve dollars annual dues. Membership in the temple required good standing in one or the other of two Masonic bodies —" a Commandery or Preceptory of Knights Templar or a Consistory of the Ancient and Accepted Scottish Rite." Little proof was offered concerning the religious or educational purposes of Syria Temple. The temple claimed a right to take the benefits under the will by seeking to show that in actual practice it spent a sufficiently high percentage of its funds on charitable objects to require a fact finding that it is " principally " a charitable institution. Its Exhibit 7 shows its income and disbursements from 1933 to 1937, inclusive. The annual receipts in this period are shown to have ranged from a low of $155,614.51 to a high of $177,402.27. The 1937 income was $177,273.51. Taking that year as typical it appears that $28,752 was paid to the Crippled Children's Hospital at Pittsburg, $1,492 for taxes on the hospital site, $2,992 on " welfare," $4,783.93 on " Christmas gifts to orphans," $29,369.72 for " administrative expense," $39,351.01 to cover the deficit in the real property operations of Syria Improvement Corporation, $6,930.50 for dues to the Imperial Council, and $62,133.70 for " ceremonials, entertainments, sundry and travel, working units and annual meetings." These disbursements left a surplus of $1,468.27. The purely charitable expenditures represent slightly less than thirty per cent of the gross income. The administrative and general expenses represent more than double that proportion of the gross. As respects Syria Temple's own claim, therefore, the problem is presented whether under the law of Pennsylvania an unincorporated association may take a testamentary donation — not stated in the will to be for any charitable purpose — on a showing that in practice its funds are devoted to the extent of thirty per cent to charitable uses and seventy per cent to fraternal and social uses. When the law on the subject is later discussed in this opinion the status of the allied corporations will also be treated.

(d) *New Mexico Consistory.*— Paragraph fourteenth of the will and paragraph third of the codicil prescribed for " New Mexico

Consistory No. 1 (Valley of Santa Fe, Orient of New Mexico) " the same benefits as are prescribed for the three unincorporated associations just dealt with. This unincorporated association has not appeared, but an appearance has been filed by a New Mexico corporation known as " Santa Fe Lodge of Perfection No. 1, Ancient and Accepted Scottish Rite of Freemasonry." This corporation claims by its appearance that it is the legatee named in the will of the decedent as " New Mexico Consistory No. 1 (Valley of Santa Fe, Orient of New Mexico)." The proof presented by the corporate claimant was designed to establish that there is a misnomer of it in the will and that deceased intended it to receive the benefits given by name to the unincorporated association. The statutes of " The Supreme Council, Thirty-third Degree of the Ancient and Accepted Scottish Rite of Freemasonry of the Southern Jurisdiction of the United States of America," authorized the Supreme Council to grant to suitable persons the right to establish (a) a Lodge of Perfection, (b) a Chapter of Rose Croix, (c) a Council of Kadosh, and (d) a Consistory. The first named may confer degrees from the fourth to the fourteenth, inclusive, the second from the fifteenth to the eighteenth, inclusive, the third from the nineteenth to the thirtieth, inclusive, and the last the thirty-first and thirty-second degrees. By article XV, section 18, of these statutes each subordinate body " is required to retain control over its own financial affairs and to administer them by the vote of its members," provided that where bodies are located in one place and consent thereto the funds may be managed and controlled by the Lodge of Perfection. By section 22 no body of the rite may become a body corporate, but by permission of the Supreme Council trustees may be selected to organize under the civil laws of the jurisdiction where they are located a corporation " to acquire by gift, devise or purchase, and hold title to real or personal property *for the use and benefit of such Body or Bodies.*" (Italics supplied.) Up to 1908 the Supreme Council appears to have authorized only a Lodge of Perfection in the Santa Fe area. In 1908 charters were granted by the Supreme Council for the establishment of a chapter, a council and a consistory. These four subordinate unincorporated bodies authorized the formation of a corporation which was to bear the name " Santa Fe Lodge of Perfection No. 1, Ancient and Accpeted Scottish Rite of Freemanonry." This corporation is shown by the contemporary minutes of the four organizations to have been intended as the medium for the financing and construction of a building for the use of the four associations, all of which bound themselves to stand behind a bond issue of the corporation. The corporate charter states its purpose to be " the

promotion of fraternal relations among men and the dispensation of charity among the needy and afflicted." The corporation's directors must in each instance be members of the four unincorporated bodies. The corporation is empowered to acquire property by donation or in any other lawful manner. It was organized pursuant to a statute of New Mexico which authorized corporations having " religious, benevolent, charitable, scientific or literary purposes." Express authority to take property by bequest is conferred by statute on such corporations. The corporate life is fifty years.

Admission to a Lodge of Perfection requires that the applicant be a member of a " Blue " lodge and that he reside within the jurisdiction of the Lodge of Perfection. He may progress from the Lodge of Perfection to the chapter, then to the council and finally to the consistory. In the Santa Fe jurisdiction the Lodge of Perfection has 1,811 members. The consistory has about 1,788 members. The members of the various bodies meet monthly and conduct " reunions " at which the degrees are " exemplified." These meetings are in the building owned by the corporation. This is now subject to mortgage of $50,000. It is exempt from local taxes.

The entire group of subordinate organizations in the Santa Fe jurisdiction are shown to have dispensed as charity about $1,000 to $1,200 a year. All of this was in the nature of almsgiving. A witness called in behalf of the corporation said in respect of the unincorporated bodies: " The general purposes are * * * to teach the fundamental principles of the Masonic organization, which is a philosophy of life. It is not to be classed as a religion, but it does teach its membership a better life. The Scottish Rite of Masonry is essentially, much more so than the Blue Lodge of Masonry, educational * * *. The objects of the organization are fraternal, benevolent and educational. By ' benevolent ' I include the word ' charitable.' " The disbursements of the funds of this group of unincorporated organizations can be classified as charitable only to the extent of about eight per cent. The witness for the corporation said that the only educational purpose of the group was accomplished in the degree work.

(e) *Bradford Lodge, B. P. O. E.*— A gift of $5,000 is made in paragraph fifteenth of the will to " The Lodge of Benevolent and Protective Order of Elks, located in Bradford, Pennsylvania." The lodge has a membership of about 500. A witness called in its behalf stated: " The objects and purposes of the Bradford Lodge are brotherly love, justice, fidelity and charity * * *. In our particular lodge charity." The lodge conducts Flag Day celebrations,

safety campaigns, programs designed to disseminate Americanism and memorial services for its members. It distributes baskets of food at Christmas time. It provides a tonsil clinic for needy children. The lodge spends about fifty per cent of its gross income on outright charitable gifts. In one year, when its gross receipts were $7,925.21, its disbursements for charity amounted to $3,891.34.

(f) It is evident from the foregoing outline that no one of the claimants to the gifts to unincorporated associations is exactly like any of the others. In a general way, however, Northern Star Lodge and Trinity Commandery rely — the former exclusively and the latter chiefly — on their religious character to qualify them as recipients of legacies. Syria Temple and Bradford Lodge both stress the amounts of money actually expended by them on charity. Syria Temple is resting, too, on the arguments urged in behalf of Northern Star Lodge and Trinity Commandery. It accedes apparently to the proposal to make payment to one or the other of the corporations which claim the gift to it if the court shall refuse direct payment. The Santa Fe Consistory gift is claimed by a corporation not named in the will which relies expressly upon a contention that the will contains a misnomer. From this premise the corporation argues that it may validly take the gift by reason of the statute under which it was organized.

### III. Law Governing Capacity of Legatees to Take.

While the will of deceased is probated as that of a resident of this State, it is the law of this State that the domicile of the legatee determines his capacity to take testamentary benefits. While the early cases laid down a different rule, it is now established that if the legatee is competent to take under the law of the legatee's domicile the gift is valid even though invalid in this State if made to a similar organization here. (*Bascom* v. *Albertson*, 34 N. Y. 584, 587; *Chamberlain* v. *Chamberlain*, 43 id. 424, 433; *Matter of Huss*, 126 id. 537, 544; *Hope* v. *Brewer*, 136 id. 126, 133, 134; 32 Col. L Rev. 680, 685.)

### The Pennsylvania Law.

The law of Pennsylvania governs the status of four of the five legatees whose particular histories have been given hereinabove. Counsel for these legatees have filed briefs which assert that under the law of Pennsylvania an unincorporated association may take a legacy provided the association's chief objects are charitable. Conceding the correctness of this statement as one of abstract principle, the reason for the principle must be developed from a review of the Pennsylvania cases so that its limitations may be fully understood. The fundamental fact must first be stated that

in the law of Pennsylvania an unincorporated voluntary association does not constitute a legal entity. " Such an association is not recognized as having a legal existence apart from its members * * *. There is no such entity known to the law as an unincorporated association." (*Maisch* v. *Order of Americus*, 223 Penn. St. 199; 72 A. 528, an action in assumpsit.) Such an association may not be sued in trespass for personal injuries (*Grant* v. *Carpenters, etc.*, 322 Penn. St. 62; 185 A. 273); nor be sued for debt on an insurance benefit certificate (*Oster* v. *Brotherhood*, 271 Penn. St. 419; 114 A. 377); nor be made defendant in a quo warranto action (*Taylor* v. *Order of Sparta*, 254 Penn. St. 556; 99 A. 157); nor be made defendant in an action for trespass *quare clausum fregit et de bonis asportatis* (*Wolfe* v. *Limestone Council*, 233 Penn. St. 357; 82 A. 499); nor take a grant (*Kirk* v. *King*, 3 Penn. St. 436); nor take a devise (*Civic Club of Harrisburg* v. *Payne*, 19 Dauphin [Pa.], 150. Thus it is established that there is no difference between the law of Pennsylvania and the great body of legal opinion expressed in the decisions of other States holding that when the question is presented with no modifying factors an unincorporated voluntary association is a non-existent thing with no capacity to take property or to sue or be sued. Starting with this basic consideration, the Pennsylvania authorities have been examined with a view to ascertaining whether a principle of decision consistent with the basic rule is to be found in those cases which seem on casual inspection to depart from it. The analysis which follows exhibits, as the court believes, the controlling factors in the authorities.

In the early case of *Kirk* v. *King* (*supra*) one McElroy conveyed land for the use of a school to the Plum Creek School Company, an unincorporated association. The court said (pp. 440, 441): " McElroy's conveyance ' to the employers of the School at Plum Creek,' being to an unincorporated association, was void at law for want of a grantee capable of taking; and the legal title remained in the grantor, subject to the uses declared in the deed." Prior to this decision the Circuit Court of the United States for the Eastern District of Pennsylvania in *Magill* v. *Brown* (Brightly's Reports, 346 [1833]) had considered at very great length the law of charities in Pennsylvania. The specific question before it was whether the Society of Friends, an unincorporated religious body, had capacity to take a testamentary gift. Giving an affirmative answer to this question, the court said (p. 378): " The yearly meeting of Philadelphia is a Protestant religious society, which has existed from the settlement of the colony, with known and recognized capacity of taking and enjoying property according to the law and usage of the Province and State, as well as the principles of the common law.

They must be considered as a body politic or corporate by prescription, possessing and enjoying the franchise of succession, with the same rights of property as a natural person does by inheritance." Not long after these two decisions were made the highest court of Pennsylvania, in *Pickering* v. *Shotwell* (10 Penn. St. 23), upheld a gift to the monthly meeting of Friends of Philadelphia, an unincorporated society for " distribution of good books among the poor people in the back part of Pennsylvania." Again, in *Evangelical Association's Appeal* (35 Penn. St. 316 [1860]), it was held that a bequest to "Evangelical Association or Communion," an unincorporated society using its funds solely for charitable purposes, was good. The court there said that "unincorporated religious societies are capable of taking legacies." This case was followed by *Yard's Appeal* (64 Penn. St. 95) and *Lawson's Estate* (264 id. 77; 107 A. 376). In the latter case the court said (p. 382); " It is now settled in Pennsylvania that *a bequest for religious or charitable purposes may be lawfully made to an unincorporated society.*" (Italics supplied.) In *Frazier* v. *St. Luke's Church* (147 Penn. St. 256 [1892]) the question was whether a devise to a charitable use would fail because made to a foreign body which under Pennsylvania law lacked capacity to receive it. The court said it would not fail. In the course of its opinion the court referred to the case of *Zimmerman* v. *Anders* (6 W. & S. [Pa.] 218) in the following terms: " It was there held, that ' a devise to an association for religious purposes, unincorporated at the testator's death, but since incorporated, is good in Pennsylvania.' *There the devise was to a myth. A devise to an unincorporated association is a devise to nobody. But the devise in this instance did not fail, and why? Because it was for a charitable or religious use, and the beneficiaries were the real owners.*" (Italics supplied.) In *Civic Club of Harrisburg* v. *Payne* (*supra*) a gift was made to the club while it was yet an unincorporated association. The objectives of the club were conceded to be *exclusively charitable*. The court reiterated the underlying rule of incapacity of an unincorporated association and then supplied in the following terms the basis on which a gift thereto may be validated: " It is true that a devise to an unincorporated association is void at law, but such a devise is not permitted to fail if it be for a charitable or religious use. *The beneficiaries are the real owners.* In the present case the people of Harrisburg are the beneficiaries. The devise is given for their benefit, and it does not fail because the association to which it is made *is incapable at law of taking it. The trust may be committed to the association to be administered.*" (Italics supplied.) (See, also, *Africa* v. *Trexler,* 232 Penn. St. 493; 81 A. 707; *Hawk* v. *Hawk*, 88 Sup. Ct. [Pa.] 581, 586; *Latrobe Hunting & Fishing Club, Limited,* v. *Decker,* 12 D. & C. [Pa.] 63, 65.)

The cases reviewed above demonstrate beyond question that the true principle declared by the Pennsylvanie decisions is that the Pennsylvania courts as a primary inquiry *investigate the use* to which a gift is devoted by the donor. If this use proves unmistakably to be charitable a gift will not fail notwithstanding the fact that it is committed to the care of an unincorporated association. But, as these cases show, *if the gift is to an unincorporated association and not to a charitable use* it is void. It is not that Pennsylvania departs from the common-law doctrine that unincorporated associations are in law nothing whatsoever. It is that in Pennsylvania a charitable use will not be allowed to fail. Unincorporated associations are recognized only to the degree that they are permitted to administer charity. By some Pennsylvania cases this power has been called a capacity to take a legacy. Unless such "capacity to take" means *merely* a permission to *administer* property — legally as well as beneficially in the ultimate beneficiaries — then it becomes impossible to bring the Pennsylvania authorities into harmony. The foregoing discussion and the discussion found hereinafter of cases dealing with a Pennsylvania statute limiting testamentary gifts to charity in wills executed within thirty days prior to death make it clear that if the gifts to the unincorporated associations are here to be validated there must be a finding by the court that the gifts were made for *charitable uses.*

To commit his property to charitable uses under Pennsylvania law a testator is not in all instances required to describe the use. Where an outright donation is made to a corporation or association the purposes and activities of which are exclusively charitable the Pennsylvania courts hold the bequest to be one for the institution's general purposes. The inference thus drawn where the gift is to an institution which is wholly charitable may be compared with the old established rule that a bequest to a natural person whose profession is charitable will raise no inference that the gift was intended for charitable uses. (1 Jarman on Wills [5th Am. ed.], p. 401.) The Pennsylvania court has given an adequate explanation for the divergent rules thus governing natural and artificial persons. To an argument made to it that because no inference favoring a charitable use could be drawn when a gift is made to a natural person professionally engaged in charity none could be drawn where the gift was to an artificial person so engaged, the court, in *Evangelical Association's Appeal* (*supra*), said (p. 321): "However true this may be [that no inference of trust intent on the part of donor is raised] where the devisee is a natural person, and where, consequently, *he has interests of his own, distinct from those which appertain to him as a professional man,* the reason for it altogether

fails, when the donee is an artificial being, *having but one character, and that charitable.*" (Italics supplied.)

Since the multiple purposes of a natural person prohibit the inference that an outright gift to such a person is deemed earmarked exclusively for any one of his many objectives, it is likewise true that the same rule must apply where a voluntary association has not one but many purposes some of which are non-charitable. The reason for the rule against drawing inferences is as strong in the latter case as it is in the former, and the court would have no hesitancy in holding this rule to be the law of Pennsylvania were it not for a dictum in *Lawson's Estate* (264 Penn. St. 77; 107 A. 376), where the court, while synopsizing what it conceived to be the Pennsylvania law on charities, incidentally remarked that " Where a legacy is given in general language to an association organized *chiefly* for charitable purposes, the presumption is that testator intended the bequest *solely* for the charitable uses of the legatee society; and there is an implied trust that the money shall be so used." (Italics supplied.) This statement may be assumed to be the law of Pennsylvania. It shows that the *minimum* requisite for validating the gifts to the Pennsylvania claimants here (who are unincorporated associations) must be that they demonstrate that they are severally institutions chiefly existing for charitable purposes. The questions thus are posed: What are charitable purposes under Pennsylvania law? And are the purposes of the unincorporated associations now here chiefly charitable?

The first of these questions should be carefully distinguished from an inquiry into the nature of a charitable intent or motive *on the part of the donor*. The true sense of the question now being investigated is this: Under the law of Pennsylvania what objective purposes pursued by institutions are held to be charitable? If to enumerate them be impossible (and, indeed, such is the fact) then by what marks shall any allegedly charitable purpose be tested? Thus formulated, the question can be answered. According to the court in *Philadelphia* v. *Fox* (64 Penn. St. 169): All charities are in some sense public. If a trust is for any particular person, it is not a charity. *Indefiniteness is of its essence.* These views were echoed by the same court in *Fire Insurance Patrol* v. *Boyd* (120 Penn. St. 624; 15 A. 553) where the court quoted with approval the definition of a charity given by Justice GRAY in *Jackson* v. *Phillips* (14 Allen [Mass.], 556): " A charity in the legal sense may be more fully defined as a gift to be applied consistently with existing laws *for the benefit of an indefinite number of persons,* either by bringing their minds or hearts under the influence of education or religion, by relieving their bodies from disease, suffering or con-

straint, by assisting them to establish themselves in life or by erecting or maintaining public buildings or works or otherwise lessening the burdens of government." (Italics supplied.) This definition was again quoted and approved in *Archambault's Estate* (308 Penn. St. 549; 162 A. 801) and constitutes the Pennsylvania law on the subject.

It must be understood of course that a charitable use means one *existent in fact* and not merely existent *as a paper organization.* (*Matter of Syracuse Masonic Temple,* 270 N. Y. 8.) In considering the claims presently being made by Masonic organizations it is not possible to reach sound conclusions based merely on abstract characterization used by the courts of various States in respect of their quality in cases where these organizations were before the courts either as legatees or as petitioners for exemption from realty or other taxes. It was correctly said in *Morrow* v. *Smith* (145 Iowa, 514; 124 N. W. 316), a case dealing with a Masonic lodge, that where a question is raised whether such a lodge is a charitable institution the question " is one of mixed law and fact."

The court has found three Pennsylvania cases which refer to the status of Masonic societies as charities. In one of these cases (*Appeal of Woolford,* 126 Penn. St. 47; 17 A. 524) the question concerned the union of theretofore separated Masonic orders. The opinion below, approved on the appeal, included a statement: " It seems to be settled, notwithstanding the doubt expressed by Judge POMEROY in his work on Equity (Section 1019, note 2); that a lodge of Freemasons is a charitable association. 2 Perry, Trusts, § 705 (and cases collected in note 6). It appears from so much of the unalterable fundamental law of the Ancient York Masons as it is not unlawful to publish, that religion, morality, and the duty of charity (at least toward fellow Masons and their families) are inculcated and required in all members of that society, so that the donees in the present case are clearly charitable associations; and it is certainly settled in this State that a gift to a charitable association, without specifying any particular use to which it is to be applied, is none the less on that account a charitable gift." The court below had obviously referred to the second edition of Perry on Trusts, published in 1874. The volume and section number cited in the quoted excerpt has appended to it a note 6 in which are listed the same cases as are found in note 85 to section 705 (page 1196) of the seventh edition of Perry. These cases are *King* v. *Parker* (9 Cush. [Mass.] 71); *Vander Volgen* v. *Yates* (3 Barb. Ch. 242); *Duke* v. *Fuller* (9 N. H. 536); *Everett* v. *Carr* (59 Maine, 325) and *Indianapolis* v. *Grand Master* (25 Ind. 518). After citing them Perry adds: " See *Babb* v. *Reed,* 5 Rawle

[Pa.] 151," a case discussed hereinafter. *King v. Parker* on examination proves to be a case where the income of a gift made to a Masonic lodge *was earmarked for alms* and was not designed for the donee's general purposes. This case is not germane to the present issue. *Vander Volgen* v. *Yates* was a New York case in Barbour's Chancery Reports which was the *subject of an appeal* decided at 9 N. Y. 219. The Court of Appeals there expressly refused to decide whether a Masonic lodge is a charitable institution. It said (p. 227): " It has been assumed that the use expressed in favor of St. George's Lodge  *  *  *  [the Masonic organization] was not valid as a charitable use. But it was not necessary to decide that question." In *Duke* v. *Fuller* it was held that where Masonic funds were earmarked for a charitable use the members of the lodge could not thereafter withdraw them from this use for division among themselves. The holding in *Everett* v. *Carr* is best indicated by quoting a statement which the same court later made in *Bangor* v. *Masonic Lodge* (73 Me. 428): " All that was decided, [in *Everett* v. *Carr*] was, that ' *incorporated* Masonic lodges might receive, in trusts, property devised for charitable purposes.' *They could hold property as trustees, as towns, or individuals can, but that does not make the towns, lodges, or individuals, public charitable institutions.*" (Italics supplied.) The case of *Indianapolis* v. *Grand Master*, according to the criticism of that decision which is to be found in *Mason* v. *Perry* (22 R. I. 475; 48 A. 671), should have been decided on the ground that the Masonic lodge was a " benevolent " *corporation*, as the bill of petitioner there had alleged. In short, the supposed support for the generalization made by the lower court in *Woolford's Appeal* (*supra*) proves on examination to be lacking.

The second Pennsylvania case is *Delaware Co. Institute of Science* v. *Delaware Co.* (94 Penn. St. 163, 165). The opinion says: " The Society of Masons, Odd-Fellows, and kindred associations are undoubtedly charities, but not purely public ones, and, therefore, their real estate is not exempt from taxation." The third case on the subject is *Kellner* v. *Stahl* (7 D. & C. [Pa.] 95) where, with reference to Kensington Lodge No. 211 Free and Accepted Masons (presumably one lodge in the group of which Northern Star Lodge No. 588 is another), the court made the following findings of fact:

" It is not engaged in commercial business of any kind, neither is it a beneficial society [see below for commentary on this point] but *its essential purpose is fellowship* within the rules and regulations of the fraternity and according to its ancient usages and customs. Its revenue is derived from dues regularly paid to it by its members.

" The said lodge, under its by-laws, has a committee on charity, consisting of three members, to whom should be referred all petitions for charity after being read in open lodge, and it was the duty of such committee to determine whether such applicant was worthy to receive charity from the lodge, and, if so, the committee might request the worshipful master to draw orders on the treasurer for such sum as might be granted by the lodge.

" The books of the lodge show that during the year 1908, the year of Mary Maier's [deceased's] will, its total disbursements were $6,986.97, of which $398.15 were disbursed for charity.

" No member of the lodge has a right to demand any financial relief. Where any relief is granted, it is confined to members of the lodge and their families.

" *The said lodge was not, at the time of the execution of the said will of Mary Maier, and never has been, a charity or an organization for religious or charitable uses.*" (Italics supplied.)

These facts have been given *in extenso* from the opinion because of their similarity to the facts developed respecting the Masonic associations now before this court, particularly in respect of actual use of funds for charity. In its legal opinion on the basis of the facts found by it the court in *Kellner* v. *Stahl* examined authorities dealing with the status of such lodges with reference to charitable uses. The court said that the case before it was more nearly related to *Babb* v. *Reed* (*supra*) and *Sharp's Estate* (71 Sup. Ct. [Pa.] 34) than to any other Pennsylvania decisions. The court then concluded: " Upon such evidence it is not believed that the lodge can be said to constitute a charity. Both in theory and practice, the giving of any money for that purpose was obviously a decidedly minor feature of the work of the lodge. The mere fact that it may have given a few hundred dollars to charity does not make it a charity."

There are two aspects of this decision which require comment. The first is the court's concentration — perhaps undue concentration — on charity in the sense of almsgiving. Pennsylvania takes a generous view of the nature of a charitable use. This is implied in the various cases cited above. To what has already been said it is desirable to add the words of the court in *Donohugh's Appeal* (86 Penn. St. 306, later cited with express approval in *White* v. *Smith*, 189 id. 222; 42 A. 125): " The commonest and most familiar meaning of charity is almsgiving, but that narrow definition is not the primary or most important one given in the dictionaries or sanctioned by the usage of English-speaking people. The moment the word is used in connection with the present subject-matter of charitable gifts or charitable institutions, the popular

as well as legal mind takes in at once its wider scope of good will, benevolence, desire to add to the happiness or improvement of our fellow beings. * * * The essential feature of a public use is that it is not confined to privileged individuals, *but is open to the indefinite public.*" (Italics supplied.)

In the *Kellner* case the court apparently did not explicitly explore the quality of Kensington Lodge save from the standpoint of material charity — almsgiving — although it did find as a bald fact that the lodge was not a religious organization. Its failure to consider more fully the broader aspects of charitable uses, including religious uses, plainly weakens its authority — as counsel here have contended. On the other hand, the court in that case (and this is the second aspect of the case requiring comment) left undeveloped its own opinion that *Babb* v. *Reed* (*supra*) most nearly matched the situation with which it was confronted. In *Babb* v. *Reed* it was held that a lodge of Odd Fellows was not a charity but a " beneficial " association. From the report of the case it seems to be indicated that certain members of the lodge had claims as creditors against the surplus moneys remaining after a foreclosure and that such claims were asserted to be on a parity with claims of non-lodge members for work done seemingly in connection with the erection of a building. The court's decision appears to be based on the idea that if the property was devoted to a charitable use all of the claimants were on a parity whereas if the property was beneficially owned by the members (because the lodge did not constitute a charity) they were relegated to a status as owners and so were deferred to the claims of non-lodge members. The court held that the lodge was not a charity and so that the out-siders were entitled to a preference in payment.

This discrimination between an association engaged in a charitable activity and devoting its property to a charitable use and the status of an association as a *beneficial* society is sharply presented by a group of cases which deal with the statute of Pennsylvania making void gifts to charity by instrument executed less than one month prior to death (Act of Assembly, April 26, 1855, section 11 [P. L. 328], subsequently amended in 1911, 1917 and 1935 and now section 195 of Decedents' & Trust Estates Law of Pennsylvania). As originally formulated this law said: " No estate, real or personal, shall hereafter be bequeathed, devised or conveyed to any body politic or to any person, in trust for religious or charitable uses, except the same be done by deed or will, attested by two credible and at the same time disinterested witnesses, at least one calendar month before the decease of the testator or alienor, and all disposition of property contrary hereto shall be void and go to the

residuary legatee or devisee, next of kin, or heirs, according to law."
In its present form, as amended by Laws of 1935, the statute says:
" No estate, real or personal, shall be bequeathed or devised to
any body politic, or to any person in trust for religious or charitable
uses, except the same be done by will at least thirty days before the
decease of the testator; and all dispositions of property contrary
hereto shall be void and go to the residuary legatee or devisee,
heirs or next of kin, according to law." This statute was under
consideration in *Swift* v. *Easton Beneficial Society* (73 Penn. St.
362). The question was whether a bequest made to the beneficial
society by a will executed less than thirty days before the death
of the deceased was valid. The question was raised in an " amicable
action." The court said: " By the case stated it was agreed that:
' If the court be of opinion that the said The Beneficial Society
of the Borough of Easton, is a society for charitable uses, under
the act of the General Assembly of the Commonwealth of Penn-
sylvania, approved April 26, 1855, the judgment shall be entered
for the defendants [the executors]. But if the said plaintiff is
not a society for charitable uses, then judgment to be entered for
the plaintiff in the sum of one thousand dollars,' etc." The
court found that the beneficial society was not a charity. It
does not appear from the opinion whether the beneficial society
was incorporated and there is consequently no discussion of the
question whether an unincorporated non-charitable institution
has capacity to take a testamentary bequest. A similar situation
exists in *Sharp's Estate* (71 Sup. Ct. [Pa.] 34). There the residuary
estate of the deceased was given in equal shares to the Old Men's
Home of Odd Fellows, the Rebekah Home of Odd Fellows and to the
Grand Council Improved Order of Red Men. The opinion of the
court shows that the question was whether these beneficiaries were
charities within the meaning of the 1855 statute. It appeared that
the two homes of Odd Fellows were corporations. Nothing is
shown in the opinion respecting the status of the Council of Red
Men. The court found that none of the beneficiaries was a chari-
table organization. It followed that the gifts made to them were
validated. There was no discussion of the question whether an
unincorporated non-charitable institution has the capacity to take
a testamentary bequest.

In *Herbig's Estate* (11 Erie [Pa.], 269) the " Odd Fellows Home
of Western Pennsylvania " appears to have been given a legacy
in a will executed less than thirty days before the death of the
deceased. The court held that the legatee was not a charity and,
therefore, that the gift had not been made for a charitable use.
Apparently the gift was validated. In this case also the question

whether an unincorporated non-charitable association has capacity to take a testamentary gift is not discussed. Finally in the *Kellner* v. *Stahl* case (*supra*) the gift to Kensington Lodge was validated but the court neither indicates whether Kensington Lodge was incorporated or unincorporated nor does it advert to the question whether an unincorporated lodge existing for non-charitable purposes possesses or lacks capacity to take a testamentary donation. This body of cases furnishes no authority for the proposition that *unincorporated* associations of a non-charitable quality have capacity to qualify as legatees. On the other hand, they are authorities which (when considered in connection with *Babb* v. *Reed, supra*) definitively establish that the claimants here are classifiable under Pennsylvania law as mutual benefit societies and are not charitable organizations. When the Pennsylvania courts have squarely faced the question whether an unincorporated association can take an outright testamentary donation as, for example, in *Evangelical Association Appeal* (*supra*), they have uniformly held or implied that this capacity *presupposes a charitable quality in the recipient*. Indeed claimants here by their proofs and by their argument have not indicated that they contend for any different principle.

The distinction between a beneficial and a charitable society is clear. In the beneficial society the world outside the association's doors is essentially a stranger. *The beneficial society is regardful only of its members.* It constitutes a group of insiders. Its membership is formed of candidates able to satisfy onerous conditions — financial, moral, civil, etc. The members have been drawn together by a mutual desire to be as they are. Once assembled they exclude all other persons from their society activities. The charitable institution is exactly the opposite in all the stated particulars allowing of comparison. To a charity the world outside is a world, the inhabitants of which should all be united as brothers. In the perspective of a charity this world is sick or ignorant or vicious. It requires to be cured or educated or redeemed. The managing members of a charitable organization expect to get nothing for their labors. Charity seeks primarily the good of others. Even the consolation which may be derived from performing works of charity is irrelevant to the main idea. Charity is the proof of the profound paradox that to get one must give *but the giving must not be for the purpose of the getting*. Every charitable use is open to the whole world so far as is practicable. Where it is a religious use it is literally open to an indefinite number (Compare *Fire Insurance Patrol* v. *Boyd, supra*) and is a use which strives directly or indirectly to pour out benefits designed to

elevate the spiritual in the generality of men. Where it is educational or takes the form of giving alms, of feeding the hungry, or of curing the sick, then for purely practical reasons it sometimes operates only on a class; but within that class it makes no distinctions. To qualify for admission to the primary benefits of charity the cardinal and sole requisite is need. *Charity is regardful of others.* To it the idea of a group of insiders excluding all outsiders — an idea so essential to an interpretation of the nature of a fraternal organization, especially secret fraternal organizations — is abhorrent.

If a Masonic lodge is a religious organization in fact (this record supplies no basis for such a ruling) it is not a religious use which is a charity. The proofs in this case permit no more than a finding that it is *a spiritual mutual benefit or " beneficial " association.* Hence *Babb* v. *Reed* (*supra*) and similar cases are here the controlling authorities on the question of the quality of the claimants under consideration though those cases were occupied with beneficial societies merely from a pecuniary standpoint. If a gift be made to a denominational group or for a specific religious use or to a missionary society or for the purpose of extending Christ's Kingdom on earth (as in a notable case in New York), the gift is charitable because in every instance the ultimate purpose is to facilitate the propagation of the " idea of the holy." But the proofs here show that any spiritual benefits of Masonry are confined to the lodge members. The claimants that rely on the religious use idea to qualify for the gifts here argue that Masons, *privately* benefiting from their secret practices, fulfill a *public purpose* by becoming men of sterling worth and thus men who confer a benefit on the community. The community gets the benefits of a religious use, they say, since the members of the lodge, owing to the lodge's secret practices, become law abiding, patriotic and spiritually minded citizens. This argument impliedly is in the nature of an avoidance of a status as mutual benefit societies, which if admitted would disqualify them under the cited cases. The Masonic lodge at the maximum can give to the community at large only the *functional effects* of religion. Its religious practices — if existent — are kept closely guarded within its own secret precincts and, in respect of them, the society is unambiguously a mutual benefit association.

Many decisions on the subject of lodge quality have been made but the precise question whether a Masonic lodge is a religious use has seldom been litigated. In New York an interesting dictum respecting secret societies generally from the standpoint of religious quality appears in *Matter of Fay* (37 Misc. 532, 534) where Surrogate

CHURCH said: " It seems to me, further, that a religious corporation should be one formed primarily for religious purposes; exercising some ecclesiastical control over its members, having some distinct form of worship, and some method of discipline for violation thereof, and that the mere fact that it has been formed for a good and worthy object, in which incidentally there will be some religious exercise involved, does not make it a religious corporation * * *. In this connection I might say that we know many secret societies have certain religious and solemn rites which they perform, yet it could not be said that because this object is a worthy one *for the advancement of the condition of their members, and incidentally some religious services* that they come within the technical definition of a religious corporation."

The effect of secrecy in a society's ritual caused the court to say in *Washington Camp* v. *Board of Equalization* (87 N. J. L. 53, 55; 93 A. 856) that: " Moreover, the facts appearing by stipulation, that the proceedings of the ' camp ' are ritualistic in character, and that its sessions are secret, give rise to a fair inference that this body is also essentially social in character."

Why should secrecy of practices import the social rather than the charitable if it be not for the reason that the social signifies not merely a group of members in agreement with one another but *out of agreement and differentiated from others* on bases voluntarily established by the wills of the society? In contrast, the charitable signifies the unification or rapport of individuals with reference to the relief, the education and the uplift of the unfortunate many, the uneducated mass and the indefinite and undefinable group needing spiritual betterment. The briefs discuss at some length the Nebraska cases of *Scottish Rite Building Co.* v. *Lancaster Co.* (106 Neb. 95; 182 N. W. 584), decided in 1921, and *A. & A. Scottish Rite* v. *Board of Commissioners* (122 Neb. 586; 241 N. W. 93), decided in 1932. The first cited case held expressly that a Masonic organization was not a religious organization. The second held that the determination in the first case was too narrow. It overruled the lower court in the case before it saying that it had denied the exemption from tax on a ground which denied freedom of religious practice. Whatever be thought of the conclusion reached by the Nebraska court in the second case cited it is quite plain that the opinion discloses a confusion of ideas. There is no established church in this country of course. There is complete freedom in religious practice of course. But how either of these fundamentals can be used as a test whether a secret fraternity constitutes a religious society or so conducts its affairs as to bring itself within a religious use is not clear. One does not have to deny funda-

mentals to say that a mutual benefit society is not a religious organization. A religious use as it is understood in the cases dealing with charitable uses is one which is open to an indefinite number of the human family. Such a use does not contemplate either secrecy or the express limitation of its benefits to a narrow group. The common understanding of the expressions " religious use " or " religious organization " as used in the cases is such that the court is constrained to find as a fact, on the record here made respecting the religious aspects of the work and practices of Masonic lodges, that none of them is a religious organization and that none of them devotes its efforts to what is commonly understood as a religious or charitable use within the definition of charity adopted by the Pennsylvania courts. (*Jackson* v. *Phillips*, 14 Allen [Mass.], 556; *Archambault's Estate*, 308 Penn. St. 549; 162 A. 801.) There are many cases other than those discussed herein which deal with Masonic organizations. No different view of the principles of decision are to be found in any of them.

In considering the powers of voluntary associations the court has not overlooked *Houk's Estate* (33 D. & C. [Pa.] 511). The auditor's report in that case was made the opinion of the court. The auditor appears to regard the question as novel (p. 519). He reached the conclusion that the gift there in question to a non-charitable unincorporated association was valid because the right of unincorporated associations to hold *personal* property was recognized and because they are " regarded as having a quasi corporate existence in law." The ownership of personalty by such an association is a legal fiction denoting an actual ownership by an unstable group which from time to time constitutes the membership (*Liederkranz Singing Society* v. *Germania, etc.*, 163 Penn. St. 265; 29 A. 918. Compare *Tracey* v. *Osborne*, 226 Mass. 25; 114 N. E. 959.) The fiction that an unincorporated association — a legal non-entity — is a quasi corporation is indulged solely that it may manage funds given as charity for the benefit of others. There seems to this court no basis whatever in the controlling decisions of the Supreme Court of Pennsylvania for the discrimination between personalty and realty as the subject-matter of a gift to an unincorporated association nor does there seem to be any support for the view that such associations are deemed to be quasi corporations except in those instances (like the Society of Friends) where the gift would be validated because of the religious or charitable character of the recipient. The view taken by this court is in agreement with the determination by the Federal courts when they considered the quality of Masonic institutions in connection with estate tax questions. (*First National Bank of Dallas* v. *Commis-*

*sioner of Internal Revenue,* 16 B. T. A. 719; affd., 45 F. [2d] 509; certiorari denied, 283 U. S. 845. See, also, *Matter of McReynolds,* 1 B. T. A. 815.) While a decision on a tax problem must always have been related to the terms of the particular statute under consideration it is useful to see what the Circuit Court of Appeals for the Fifth Circuit said in the case first cited. There an actual fact finding had been made by a trial court, of an issue in a controversy to which the government was not a party, to the effect that the Masonic bodies in question used their funds exclusively for charitable and educational purposes — a finding which if accepted would bring the organization within the exemptions of the revenue act. Following that determination the proceeding before the Board of Tax Appeals was had and the property held taxable by that Board. In its determination the Board of Tax Appeals said: " Benevolence is not charity. The promotion of the bonds of good fellowship and brotherly love is not charity. Such endeavors, such purposes, are noble in character and worthy of the patronage of the noblest of humankind, but they are not charitable in the sense contemplated by the tax statutes. The tax statutes limit deductions to organizations whose purposes are exclusively charitable (aside from those clearly not to be considered here) and therefore such organizations as strive to accomplish charitable as well as other purposes, however noble in character those other purposes may be, do not meet the requirements of the statutes."

In affirming the Board of Tax Appeals the Circuit Court of Appeals said: " The Revenue Act in question by section 403 exempts from an estate tax, among other things, bequests to corporations which are ' organized and operated exclusively ' for charitable purposes. The local lodges of which Pires was a member were not incorporated at all, and the Grand bodies of Masonry over them were incorporated not for charitable purposes exclusively, but for fraternal and benevolent purposes as well. Fraternal organizations may be described generally as social in their nature, and designed not exclusively for charitable purposes but for the enjoyment of their members in many ways. 5 R. C. L. 372. Charitable organizations are benevolent, but benevolent organizations are not exclusively charitable. *Chamberlain* v. *Stearns,* 111 Mass. 267. Nor are Masonic bodies operated exclusively for charitable purposes, since they carry out also benevolent and other purposes for which they were organized. The Revenue Act also exempts from an estate tax bequests made to trustees exclusively for charitable purposes, but Pires' residuary bequest was not made to the Masonic bodies as trustees; it was given to them, as it was

to the other beneficiaries without distinction, as an endowment. The Masonic bodies received their share of the bequest on the same terms as did the other beneficiaries, and so it cannot be said that the word ' endowment ' was used in a special sense as applied to any one beneficiary, or that it had a meaning understood only by Masons. The bequest could have been used without violating the will for any endowment purpose, including the construction of a temple or building for fraternal and benevolent purposes only. The verdict and judgment in the State court suit were broader than was authorized by the provisions of the will."

Rulings necessitated by foregoing discussion.

So far as Northern Star Lodge No. 555 is concerned, the conclusion of the court is that it cannot qualify to take anything under deceased's will. It made no serious effort to prove its chief activities consisted of charity in the form of educational activity or of almsgiving. The same must be said of Trinity Commandery. Like Northern Star Lodge it could show no substantial almsgiving. Its " educational " activity in relation to the " Order of De Molay " was a negligible feature of its work if indeed it were not a wholly unofficial form of activity. The testamentary bequests to these claimants are attempts to give funds to unincorporated voluntary secret fraternal associations having neither religious, educational nor almsgiving objectives as their primary purposes. The attempted gifts are, therefore, void.

The claims of Syria Temple are now to be considered. No real effort was made by this party to prove its activities to be either religious or educational. It relies on the manner of application of its finances to establish its right to take. The Pennsylvania cases already reviewed demonstrate the incapacity of this unincorporated claimant to take testamentary donations *not given for a definite charitable use.* Syria Temple's activities and purposes are not " chiefly " charitable. In a monetary sense they are not above thirty per cent charitable. Consequently no inference can be drawn from the nature of the temple that these gifts would necessarily be applied to charitable objects and that such application was necessarily intended by deceased. The bequest to the temple as such is, therefore, void. This gift, however, is sought to be sustained on the general theory elaborated in cases like *Kernochan* v. *Farmers' Loan & Trust Co.* (187 App. Div. 668; affd., 227 N. Y. 658); *Matter of Isbell* (1 App. Div. 158) and *Prudential Insurance Co.* v. *N. Y. Guild for Jewish Blind* (252 id. 493). These cases stand for two propositions: (1) That a gift to a capable beneficiary will not fail by reason of a misnomer, and (2) that a charitable gift to an incapable donee which is an auxiliary or branch or department of a capable donee will be saved by holding that the capable main

organization may take it. The assumptions present in these cases are respectively that the true but misnamed beneficiary has capacity to take and that the gift is a charitable gift as determined either by the express words of the testator or by reason of the charitable character of the donee. The inapplicability of these principles to a situation such as exists in respect of Syria Temple is illustrated by *Fisher* v. *Lister* (130 Misc. 1; modfd. but affd. on the point in question, 222 App. Div. 841). There a devise was made to the unincorporated "Amherst Rebekah Lodge." The argument was made that it could be sustained as a gift to the incorporated Grand Lodge. The court said (p. 7): "It will be noted that the bequest to the defendant Amherst Rebekah Lodge is absolute, unconditional and not qualified or limited by any trust whatever. It is unaccompanied by any designation of the purpose to which it is to be applied. It is quite true that a bequest to a department of an incorporated society, which department is inseparable from the corporation and can only be made effective through it, may be upheld as a bequest to the corporation itself." The court then pointed out that the Amherst Rebekah Lodge had an independent organization, objectives and membership. It and it only was intended by deceased to take the gift. Therefore, the court said, the *Kernochan* and *Isbell* cases did not affect the question because "The authorities that sustain a gift to a branch or an auxiliary go upon the theory that the deceased intended to name it as the legatee and in such a case the courts will not permit a legacy to be defeated by a misnomer."

These general principles of construction together with the limitation indicated in the last cited case are New York law and are really not relevant to the question of the validity or invalidity of these attempted bequests here to a *Pennsylvania* legatee. They are discussed only because they have been used in a case cited by counsel to the court. (*Matter of Upham*, 160 Misc. 126.) There the surrogate held these principles to be useful in determining that gifts made by a deceased person to three unincorporated Massachusetts Masonic lodges could be sustained as gifts to the Grand Lodge. The opinion of the court failed, however, to disclose all the facts in that case. These facts are to be found in the later opinion in the same estate reported in the New York Law Journal for October 24, 1938, at page 1281, from which it appears that the gifts there were not outright donations as in the present case but were made for the "*relief of the poor (not necessarily Masons)*." (Italics supplied.) Obviously this case in no way proves useful in the present litigation.

So far as the claims of Syria Temple and its connected corporations are concerned there are only two real questions under Pennsylvania law. In the order of priority the first question is this: What is the identity of the intended beneficiary? This question is here easily determined. It is Syria Temple, an unincorporated association having its own officers, membership, activities, etc. This association is separate from Syria Improvement Association, the corporation, which is only a realty holding company. It is separate from the Iowa corporation which, as the proofs show, manages the fraternal and social activities of the Imperial Council and has no charitable functions at all. It is separate from the Colorado corporation which operates the Shriners' hospitals and has no contact of any kind with Syria Temple. It is separate from the Georgia corporation which in times past operated certain of these hospitals and has no contact with subordinate lodges. The second question is this: Can the identified beneficiary take? This question under Pennsylvania law could be answered affirmatively *only if the gift is to a charitable use.* But it is not to a charitable use as ascertained from the words of the deceased or from study of Syria Temple's activities and purposes. Therefore, all claims made in behalf of corporations for the gifts to " Syria Temple " are in all respects disallowed. The gifts are in every respect void by the law of Pennsylvania.

The analysis heretofore made of the Pennsylvania authorities enables the court to deal more briefly with the position of the Elks lodge. The court holds that this lodge does not exist chiefly for charitable purposes. On the proofs presented it is apparent that it is essentially a fraternal and benevolent organization. As an unincorporated association it cannot take. The bequest to this lodge is, therefore, void.

### LAW OF NEW MEXICO.

There remain for consideration the claims of the Lodge of Perfection *Corporation* of Santa Fe, N. M. This claimant has not cited to the court any relevant law from the State of New Mexico apart from the statute under which it was organized together with the case of *Temple Lodge No. 6 A. F. & A. M.* v. *Tierney* (37 N. M. 178 [1933]; 20 P. [2d] 280). The statute in question authorizes incorporation for " religious, benevolent, charitable, scientific or literary purposes." The case cited dealt with whether certain realty held by a Masonic corporation was tax exempt. The court held that it was exempt, saying: " No one denies that the property is used for educational and charitable purposes " (p. 185). The court further declared (p. 187): " The present decision is reached upon the present record. We lay down no general rule as to fraternal orders

or as to Masonic lodges generally. We do not prejudge the case where the educational or charitable purposes may seem but profession or cloaks for exemption, while the real and substantial use may seem to be ostentation and indulgence." The limitations surrounding the decision in the cited case were further described by the same court in *Albuquerque Alumnæ Assn.* v. *Tierney* (37 N. M. 156; 20 P. [2d] 267). There the court expressly warns against confusing use with profession where it is a question of the reality or unreality of an alleged charitable use. And Chief Judge WATSON, who wrote the opinion in the *Temple Lodge* case, said, referring to that case: " As a pure matter of interpretation of language, it requires some liberality, we confess, to conclude that the use described in the *Temple Lodge* case is properly characterized as ' charitable.' So, on that basis, we had a doubtful case."

It is apparent that neither the statute nor the New Mexico decisions are of any great help in solving the question now here. As an unincorporated association the chief purposes of which are non-charitable, as appears from the proof here, the consistory named in the will cannot take the bequests — for such is the common law and it must be applied as the law of New Mexico in the absence of proof to the contrary. As was stated above, no claim in behalf of the consistory has been put forth in this proceeding at any time. Counsel here relies wholly on a theory of misnomer. This position is wholly untenable for the same reasons set forth in connection with the claims made in behalf of the corporations associated in one way or another with Syria Temple. Certain additional comments, however, should be made. It was testified that a Mason of the Scottish Rite of the Southern Jurisdiction upon meeting another Mason might inquire of him how matters stood at the latter's " Consistory." This was offered the court as a proof that by usage the word consistory had come to mean the corporation through which the Santa Fe co-ordinate bodies hold title to their temple. Such proof is without cogency in virtue of the other facts established. The consistory is an independent association and in no sense a department of the Lodge of Perfection Corporation. The latter on the contrary is a device whereby the consistory and the other co-ordinate bodies endeavor to overcome their inherent disabilities to take and hold property. The consistory is not a subordinate but is one of four co-ordinate masters of the corporation. Not only is the consistory not absorbed into the corporation but this is true also even of the Lodge of Perfection, the *unincorporated association* which has the same name as the corporation. (*Mason* v. *Finch*, 28 Mich. 282.) The testator here was the author of no misnomer. He named an identifiable party but one incapable of

taking a legacy unmarked for a specific charitable use. The bequests, therefore, to the consistory are in all respects void.

### INTESTATE PROPERTY.

Because five beneficiaries cannot take the gifts intended for them deceased died partly intestate. The *general* bequest to Bradford Lodge of Elks becomes part of the residuary estate and passes pursuant to article third of the codicil subject to the limitations of this decision. The *general* legacies to Northern Star, Trinity Commandery, New Mexico Consistory and Syria Temple pass through the residuary estate in like manner and subject to the same limitations. The residuary is to be computed on the basis of these accretions. So computed the residuary shares intended for the four last named associations constitute property as to which deceased died intestate. This intestate property passes to the infant grandson of deceased.

Submit, on notice, decree construing the will in the particulars stated herein and reserving to an accounting or other appropriate proceeding the ascertainment of the extent to which the gifts here validated exceed, if at all, the limits fixed by section 17 of Decedent Estate Law.